**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 94-276(DRD) |
| Plaintiff, | : | Civ. No. 01-124(DRD) |
| | : | |
| v. | : | |
| | : | **O P I N I O N** |
| LEONARD A. PELULLO | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

Paul J. Fishman
United States Attorney
By:    Leslie F. Schwartz
         Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
         Attorney for United States of America

Lawrence S. Lustberg, Esq.
Thomas R. Valen, Esq.
One Gateway Center
Newark, New Jersey 07102

**Debevoise, Senior United States District Judge**

Defendant, Leonard A. Pelullo, has moved to vacate the Judgment of Conviction and to

Dismiss the Indictment with Prejudice[1].  He now moves for bail pending disposition of his

---

[1]  Defendant, Leonard A. Pelullo, prepared and filed his very extensive i) Motion to
Vacate the Judgment of Conviction and Dismiss the Indictment with Prejudice, ii) Memorandum
of Law in support thereof, iii) Motion for Release on Bail and iv) Brief in Support of Motion for
Bail pro se.  The Court, after reading these papers in their entirety, appointed Lawrence S.
Lustberg, Esq. and Thomas R. Valen, Esq., to represent Pelullo in these proceedings.

1

motion.

On December 8, 1997 Defendant, Leonard Pelullo, was sentenced to 210 months imprisonment for the crimes of embezzlement, money laundering and criminal conspiracy. Pelullo appealed, and his conviction was affirmed.  Pelullo filed numerous challenges to his conviction and sentence.  On February 25, 2005 the Court of Appeals reversed this court's grant of Pelullo's motion for a new trial based on government violation of its Brady obligations. Thereafter Pelullo filed numerous additional challenges to his conviction and sentence.

During the appeal of this court's order granting a new trial and during subsequent proceedings in this court and in the Court of Appeals, the government repeatedly represented that the Department of Labor's ("DOL") Pension and Welfare Benefits Administration ("PWBA") was not a part of the prosecution team in this case and, apart from providing technical assistance to the prosecution, its sole role was monitoring a related civil case.  This information was material to critical court decisions, and the Court of Appeals and this Court repeatedly relied upon those representations.

Pelullo, in support of his present motion to vacate the judgment of conviction, to dismiss the indictment and for bail, has submitted evidence, largely based on government documents, that these representations were untrue and that PWBA was a key, if not the key, component of the government's prosecution team in this case.[2]

The underlying motion raises serious issues going to the integrity of proceedings before

_____

[2]  Most of these documents were obtained by means of Pelullo's FOIA requests to the DOL.  The DOL responded over the years in a piece meal fashion.  The final set of documents arrived on or about April 10, 2010.  It is only when all the documents are considered together that PWBA's role becomes unmistakenly apparent.

2

the Court of Appeals and this Court. A hearing on the bail motion has been held.

## I. Background

During the two and one-half years after the Court of Appeals affirmed Pelullo's conviction on June 15, 1999, United States v. Pelullo, 185 F. 3d 863 (3d Cir. 1999 (Table), (rehearing denied en banc August 23, 1999)), Pelullo filed a series of motions and a petition for relief pursuant to 28 U.S.C. § 2255. For a full understanding of the motions and of the discussion that follows, it would be helpful to read the detailed description of the case set forth in the court's opinion in U.S. v. Pelullo, 961 F. Supp. 736 (D.N.J. 1997).

In November, 1999 Pelullo filed a tri-partite motion for a new trial pursuant to Fed. R. Crim. P. 33. Each part developed one aspect of Pelullo's contention that newly discovered evidence disclosed that the government had suppressed and failed to disclose favorable evidence in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and had elicited perjured testimony and argued from false evidence to the jury at his trial.

The third part of the 1999 motion for a new trial relied primarily upon depositions and documents that Pelullo obtained from the DOL pursuant to an order of the court and documents obtained from the DOL pursuant to a Freedom of Information Act (FOIA) request. The depositions were of David Hellhake taken in a Florida bankruptcy matter, In re Ocean Properties of Delaware Inc., S. D. Fla. Case No. 90-11919 BRC-SM and of David Hellhake's father, George P. Hellhake taken in the same matter. In addition Pelullo relied upon the newly discovered letter dated August 30, 1989 to Douglas Miller of Shearson Lehman authorizing the transfer of the pension plan's account to A.G. Edwards. The letter was signed by Coolidge Marqueen, one of Compton Press's former owners, as well as by Raul Corona (a former defendant) and David

3

Hellhake.  Further, Pelullo relied upon the newly produced report of Gus R. Lesnevich, an expert forensic document examiner who had examined seven of the original Granada Investment Inc. loan documents and concluded that the signatures of Andrew N. Heine on each of these documents were genuine.

These documents, according to Pelullo, contradicted the government's contentions and the testimony of its witnesses i) concerning the relationship of David and George Hellhake to GH Enterprises, the role of GH Enterprises in the DWG transaction and George Hellhake's role in the ATTS transaction, ii) that Gerardi and Marqueen had not been aware of the transfer of pension funds to acquire the DWG stock and iii) that Heine had not signed loan instruments in connection with the DWG stock acquisition.

In April, 2000, prior to argument on Pelullo's new trial motion the court suggested that the government turn over to Pelullo the documents in the PWBA file, which the government agreed to do.  In January 2001, Pelullo filed a petition for relief pursuant to 28 U.S.C. § 2255 asserting 1) the Court failed to provide the jury with specific unanimity instructions, 2) the Court misapplied the sentencing guidelines in that it sentenced Pelullo pursuant to U.S.S.G. § 2S1.1, which is applicable to money laundering, rather than embezzlement, 3) the Court improperly amended Pelullo's judgment of conviction to include forfeiture provisions, and 4) the government failed to present sufficient evidence to support the conviction for money laundering.

In its May 17, 2002 opinion the Court granted Pelullo's motion for a new trial based upon Brady violations.  The Court denied Pelullo's petition for relief under § 2255 on the first and fourth grounds for relief, granting a certificate of appealability on the first ground.  It did not address the second and third § 2255 claims.

4

The court found no evidence that the government knowingly used false evidence, but held that the disclosures subsequent to trial of documents from a Florida warehouse and from the DOL's own files evidenced such a serious violation of the government's <u>Brady</u> obligations that Pelullo's motion for a new trial had to be granted on that ground alone.   <u>United States v. Pelullo</u>, Civ. No. 01-124, Crim. No. 94-276, slip op. at 12-23 (D.N.J. May 17, 2002).   The court stated:

> A critical issue, both with respect to the embezzlement and money laundering charges as well as the conspiracy charge, was defendant's intent.   The government sought to prove its version of each of the critical transactions; defendant proffered a different version of these transactions.   Even accepting defendant's version the government could have urged persuasively that there was a criminal intent. Nevertheless, defendant was entitled to present to the jury all available evidence that supported his version and that impeached the government's witnesses.   This he did not have the opportunity to do in large part because the government failed to provide him with exculpatory and impeaching information in its possession.
>
> This evidence existed in two places - the Florida warehouse and the Department of Labor's ("DOL") civil investigatory arm.   The biggest cache of documents was the huge collection maintained under government control in the Florida warehouse.   Even after the FBI had returned to defendant 75,000 pounds of these documents there remained 160 boxes and 36 file cabinets of documents.
>
> The government argues that the documents in the Florida warehouse cannot be deemed to have been suppressed because defendant had access to them before trial or by the exercise of reasonable diligence could have had access.   <u>United States v. White</u>, 970 F. 2d 328, 337 (7th Cir. 1992).   This argument ignores the reality of the situation and it ignores the representations that government counsel repeatedly made to the court and to defense counsel that the six boxes of documents that the government extracted from the mass of documents in the Florida warehouse contained everything relevant to defendant's case and that the remaining documents "are not relevant to this case."
>
> The Florida warehouse documents as well as the DOL collection of documents were within the government's custody and control.   It now appears that the government did not think to examine the DOL file

5

relating to the civil investigation in this case. The government reviewed the vast array of Florida warehouse documents with sufficient dedication and care to extract six boxes of documents enabling it to put together and present with great skill a complex case with such clarity that the jury was able to comprehend the intricate financial transactions in which defendant and his cohorts engaged. Unfortunately the government's search of its own records and the records under its control was inadequate to produce documents which cast doubt upon its theory of defendant's role in the various transactions and upon critical testimony of its witnesses.

The government contends that since the records were defendant's own records, he should have known what was in them and should have made his own examination.

…

Lynn's testimony that she met with defendant in his Miami office immediately after the $1.4 million deposit is contradicted by a newly disclosed document showing that defendant was staying at a New York City hotel on the day following the deposit of the funds. Thus significant evidence upon which the government relied to establish defendant's criminal intent with respect to the UNUM transaction is refuted by documents that had been in the government's possession and were not made available for defendant's use at trial.

The government relied heavily upon Andrew Heine, who testified, among other things, that he had not signed any documentation in connection with the $750,000 loan from the Compton Press funds to Granada for the DWG transaction. There has now been produced from the Florida documents a signed copy of the August 1, 1989 letter of understanding (D Exh 26) in which Heine acknowledged the terms of the loan and Heine's 1991 correspondence with the Laexalt Washington law firm that shows that the law firm was supplying Heine, at his request, with signed copies of the loan documents. (D Exh. 29).

Defendant further relies upon the government's failure to produce documents from the DOL's files which tend to show that Heine lied at trial when he testified that he had not signed documents in connection with the $750,000 loan to Granada, and in particular that he had not signed a promissory note in the amount of $600,000 and a promissory note in the amount of $150,000. In the DOL files were

documents derived from the civil litigation brought by the Pension funds. Seven fully executed original loan documents were produced in connection with Heine's deposition, including the $600,000 and $150,000 promissory notes. Gus R. Lennevich, an expert forensic document examiner, examined the seven original documents and compared them with four known Andrew Heine signatures. He concluded that the Heine signatures on the original documents and notes matched Heine's known signatures. The government attorneys prosecuting this case undoubtedly were unaware of this evidence that would have cast doubt upon important testimony of a key witness. However, this material was in the files of the same agency, the DOL, that prepared the present case for trial, and the government's Brady obligations extended to the contents of those files. It is true, as the government points out, that defendant was a party to the suit in which the expert submitted his report and that Magistrate Judge Chesler referred to that report in an unreported opinion filed in the case. That, however, does not relieve the government of its Brady obligations. There has been no showing that defendant was made aware of the report during the course of the civil litigation.

Defendant has proffered a number of other assertedly Brady documents derived from the Florida warehouse or from the DOL's records. It is unnecessary to describe them all in this opinion because the failure to have produced those described above is sufficient to require the granting of the motion for a new trial.

Id. at 13-14, 21-22.

The government appealed the order granting the new trial. It argued that the warehouse documents were Pelullo's, that he was familiar with them and that he had full opportunity to review them. As to the DOL documents, the government urged that the PWBA was a civil arm of the DOL monitoring a separate civil law suit and thus was not part of the prosecution team responsible to search for and turn over to Pelullo material that might be considered Brady material.

In support of its contention that the PWBA was not part of the prosecution team the government in its Third Step Brief in the Court of Appeals (Pelullo Exh. 1) stated "the PWBA

officials who possessed the documents at issue were not members of the prosecution team in this case." In a Memorandum submitted in a subsequent proceeding (Pelullo Exh. 16), the government summarized its position before the Court of Appeals: "Rather, the government contended that the agents and employees of the DOL and PWBA who were part of the prosecution team were not involved in collecting civil lawsuit documents."

The Court of Appeals reversed this court's grant of Pelullo's motion for a new trial and remanded so that the court could address the motions that it had found unnecessary to decide in light of the fact that it anticipated a new trial, United States v. Pelullo, 399 F. 3d 197 (3d Cir. 2005).

With respect to the warehouse documents, the Court of Appeals held:

> In sum, the following factors militate against a finding of suppression of the warehouse documents: (1) the massive amount of documents, which belonged to Pelullo; (2) the government's lack of knowledge as to the exculpatory nature of the material contained in the warehouse documents; (3) the defense knowledge of, and access to, the subject documents. The government's representations, the only factor weighing in favor of suppression do not, under the circumstances, negate Pelullo's duty to exercise reasonable diligence.

> We hold that the District Court clearly erred in its findings of fact and that there was no suppression of the warehouse documents.

Id. at 216.

Turning to the PWBA documents, the Court of Appeals held: "Because we reject the District Court's conclusion that the PWBA should be considered part of the 'prosecution team' we conclude the government did not suppress the PWBA documents." Id.

The Court presented the factual question as follows:

8

Here, there is no question that certain DOL agents were integral members of the prosecution team. Pelullo argues that this compels the conclusion that the PWBA (as part of the DOL) was part of the prosecution team as well, thus extending the government's <u>Brady</u> obligations to information possessed by the PWBA. The government argues that the prosecution team should not be defined to include the entire DOL, a massive federal agency. The question presented then, is whether the PWBA officials who possessed the documents at issue were members of the "prosecution team" in this case.

<u>Id.</u>

The following quotations from the Court of Appeals's opinion demonstrate that it accepted the government's characterization of the PWBA's role:

While the United States Attorney's Office in new Jersey and agents from the Labor Racketeering Office of the DOL (which is responsible for enforcing violations of federal criminal law) were investigating Pelullo's actions with respect to the benefit plans, officials of the PWBA, a civil arm of the DOL, were monitoring a separate lawsuit, <u>Gerardi, et al v. Pelullo, et al.</u>, United States District of New Jersey Civ. No. 89-4069. That case, like this one, involved the conversion of benefit plan assets. The PWBA collected documents which had been exchanged in discovery between Pelullo and other litigants in that civil case.

399 F. 3d at 209

The District Court also found that the government suppressed the PWBA documents, on the ground that the government's <u>Brady</u> obligations extended to the content of those files because "this material was in the files of the same agency, the DOL, that prepared the present case for trial." Because we reject the District Court's conclusion that the PWBA should be considered part of the "prosecution team," we conclude the government did not suppress the PWBA documents.

<u>Id.</u> at 216

Applying the general principles set forth in these cases - that the prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case - we conclude that the PWBA was not a member of the prosecution team. There is

9

no indication that the prosecution and PWBA engaged in a joint investigation or otherwise shared labor and resources. *Cf. United States v. Antone,* 603 F.2d 566, 569-70 (5th Cir. 1979) (holding that information possessed by state investigator should be imputed to federal prosecutor because "the two governments, state and federal, pooled their investigative energies [to prosecute the defendants]"). Nor is there any indication that the prosecution had any sort of control over the PWBA officials who were collecting documents.  And Pelullo's arguments to the contrary notwithstanding, that other agents in the DOL participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team. Indeed, in *Locascio*, information was not attributable to the prosecution team, even though it was known to investigators drawn from the same agency as members of the prosecution team.  Likewise here, the PWBA civil investigators who possessed the documents at issue played no role in this criminal case.

Id. at 216

The Court of Appeals's February 25, 2005 opinion reversing this court's order granting Pelullo's new trial motion did not end the controversy concerning the role of the PWBA in this case.  In compliance with the directive of the Court of Appeals, on May 12, 2005 this court reinstated Pelullo's judgment of conviction and sentence imposed on December 8, 1997. Nevertheless, on or about May 12, 2006 Pelullo moved pursuant to Fed. R. Civ. P. 60(b) to vacate the May 12, 2005 judgment of conviction and dismiss the case with prejudice or direct a new trial.  Based upon new documents he received pursuant to his DOL FOIA requests, he contended that it was upon its reliance upon the government's misrepresentations that the Court of Appeals held that the DOL and its PWBA were not part of the prosecution team and that, therefore, the government was not required under Brady to turn over to Pelullo documents held by the DOL and PWBA.

In its opinion addressing Pelullo's Rule 60(b) motion this court referred extensively to,

10

and relied heavily upon, the Court of Appeals's findings and holding concerning the PWBA role in the case, such as: "the PWBA civil investigators who possessed the documents at issue played no role in this criminal case," 399 F. 3d at 218, and "[b]ecause the PWBA was not a part of the prosecution team, the prosecution never had 'constructive possession' of the <u>Brady</u> materials." <u>Id.</u>

Pelullo argued that the new documents obtained through his FOIA requests since May 12, 2005 in conjunction with those already submitted to the court established that DOL and PWBA employees who led the civil investigation were intimately involved in the criminal investigation and prosecution and must be deemed part of the prosecution team.[3]  In its opinion in the Rule 60(b) case the court described documents that Pelullo asserted established that PWBA Agents Robert Goldberg and Carmine P. Pascale played more active and integral roles in the prosecution team than just providing accounting services.  The court's opinion also referred to new FOIA documents that Pelullo asserted demonstrated that there was extensive overlap between the civil and criminal investigating teams.  Commenting on the entirety of the PLO documents then before it, the Court stated that "the role of the DOL and PWBA agents was exactly what the Court of Appeals understood it to be: 'there is no question that certain DOL agents were integral members of the prosecution team.'" <u>see</u> 12/14/06 Opinion at 39, 2006 WL 3694590, at *22, and "that the record does not establish that the government attorneys made misrepresentations to the Court of Appeals," <u>see</u> 12/14/06 Opinion, at 41, 2006 WL 3694590, at *22.

---

[3]  Pelullo cannot be blamed for his successive challenges to the findings concerning the role of the DOL-PWBA.  The DOL has dribbled out its responses to his FOIA requests, each wave of documents providing additional, but not complete, information about that role.  Only the most recent wave of documents permits the court to derive a fuller account of the part that DOL's PWBA played in this case.

The court did not address the merits of Pelullo's Rule 60(b) motion.  Rather, it found that it was a collateral attack on the underlying conviction that was the subject of a prior Rule 33 motion.  Consequently, in accordance with Pridgen v. Shannon, 380 F. 3d 721 (3d Cir. 2004), the motion had to be treated as a successive § 2255 petition.  This required Pelullo to move in the Court of Appeals for an order authorizing this court to consider the motion.  The court transferred the motion to the Court of Appeals pursuant to Rule 22.5(b) of the Local Appellate Rules of the Third Circuit and 28 U.S.C. § 1631.

Pelullo elected not to proceed with the transferred proceedings in the Court of Appeals. However, he continued to file a series of applications which need not be described for present purposes.  In support of an October 24, 2008 motion for reconsideration Pelullo submitted a December, 2008 letter he received from Jonathan Kay, Regional Director of the Department of Labor's Employee Benefits Security Administration (formerly PWBA).  In the Court's March 10, 2009 Opinion it held that Director Kay's December 31, 2008 letter was entirely consistent with the Court's opinion that the government attorneys made no misrepresentations regarding the PWBA, stating:

> "Everything contained in the Kay letter is consistent with the facts found in the 2006 Opinion.  According to the letter, PWBA classified its investigation as a civil investigation and as two criminal investigations - the criminal investigation concerning the Compton Press Profit Sharing Plan and the criminal investigation concerning the Compton Press Thrift Plan.  As described in the 2006 Opinion, PWBA's civil investigation consisted of receiving copies of pleadings, certifications, deposition transcripts and other documents in the civil actions in this court and conferring with the Plaintiff's attorneys in those actions.
>
> PWBA's criminal investigation consisted of assigning personnel first to work with the Newark Strike Force as it conducted its wide ranging

12

> investigation of Pelullo and later assigning the same or different
> personnel to work with the AUSAs who were prosecuting Pelullo
> solely on the Compton Press related charges."

3/10/09 Opinion, 2009 WL 689680, at * 11 (D.N.J. 2009).  As will be discussed below, this

finding is an illustration of how wrong a court can be.

On or about November 19, 2009, the Court of Appeals issued an opinion summarily

affirming this Court's 1) denial on the merits of the claims left open in Pelullo's initial Rule 33

motion; 2) denial of Pelullo's Rule 33 motion to add an ineffective assistance of counsel claim

and to supplement his original new trial motion with the Michael Rich, Esq. letters; and 3) denial

of Pelullo's rule 60(b) motion alleging fraud on the federal court regarding the PWBA's

involvement in the Compton Press case.  See Pelullo v. U.S., 352 Fed. Appx. 620 (3d Cir. 2009),

2009 WL 3863329.  In summarily affirming the denial of Pelullo's Rule 60(b) claim of alleged

fraud upon the federal court, the Court of Appeals stated in pertinent part: "The district court did

not abuse its discretion in concluding that Pelullo did not produce any evidence pertaining to the

Compton Press case that warranted reopening the proceedings."  2009 WL 3863329, at * 2 fn.5.

Finally, the Court of Appeals declined to issue a certificate of appealability as to this Court's

dismissal of Pelullo's Rule 60(b) motion, seeking to vacate this Court's January 7, 2004 Opinion

denying the motion to expand the appellate record, as Pelullo's claim involved neither newly

discovered evidence nor a new rule of constitutional law made retroactive to cases on collateral

review, and further would not have affected the outcome of his trial.  2009 WL 3863329, at * 2-

3.

On or about May 17, 2010, Pelullo filed his pro se motion pursuant to Fed. R. Civil

Procedure Rule 60(b) contending that documents he recently acquired pursuant to FOIA requests

from the DOL establish that the government had continued to misrepresent to this Court and to the Court of Appeals that the PWBA was not a part of the prosecution team.

## II.  The Compton Press Investigation

In its brief and at oral argument the government sought to narrow the term "prosecution team" as used before the Court of Appeals and this Court.  In those proceedings the government characterized the DOL as having two divisions, one (the OLR) that was responsible for handling criminal investigations, and the other (the PWBA) that dealt with civil matters.  As the government stated in its First Step Brief on the appeal from the new trial order:

> While the USAO in New Jersey and agents from the Labor Racketeering Office of the DOL (which is responsible for enforcing violations of federal criminal law) were investigating Pelullo's actions with respect to the Pension Plans, officials of the Pension and Welfare Benefits Administration ("PWBA"), a civil arm of the DOL, were separately monitoring a law suit, Genards et al. v. Pelullo, et al . . . That case, like this one, involved the conversion of the Pension Plans' assets.  The PWBA collected documents which had been exchanged in discovery between Pelullo and the other litigants in that civil case.

The government insisted that, although the PWBA contributed certain personnel to assist the AUSA, overall it was not a part of the prosecution team.

In its Brief in opposition to Pelullo's motion for bail the government provides a much narrower version of its representations to the two Courts:

> Defendant inaccurately suggests that the government contended on appeal that the entire PWBA was not part of the prosecution team . . . The government never contended that.  Rather, the government contended that the agents and employees of the DOL and PWBA who were part of the prosecution team were not involved in collecting civil lawsuit documents.

(Govern. Br. at 30)

14

The government did in fact make such a representation, but that was not the full extent of its representations.  At the hearing on the bail motion the government contended that the "prosecution team" in its entirety consisted only of Goldberg, Ruffino, Rufollo, Schwartz and the FBI, a totally new suggestion entirely at odds with what all parties up to this point understood "prosecution team" to mean.

This court has understood "prosecution team" to mean those agencies and individuals directly involved and working together in the investigation and prosecution of Pelullo in the Compton Press case.  With that understanding the totality of the documents that Pelullo has now assembled is powerful evidence that the DOL's PWBA was a member (perhaps the most important investigatory member) of the Pelullo prosecution team.

The final set of documents that DOL has turned over to Pelullo and which have been submitted in support of the pending motion, in conjunction with previous submissions, enable the court to determine with some degree of confidence the composition of the "Prosecution Team" in this case.[4]

It is first necessary to identify the principal actors.  To start with there was the United States Attorney's Office in Newark, New Jersey.  It appears that at the outset of the investigation Robert C. Stewart, Chief of the Strike Force Division assumed supervision of the Pelullo, Equity Funding Group investigation.  The Strike Force was also investigating other "crash and burn" operations (P-15).  In due course responsibility for the prosecution of Pelullo's Compton Press operation devolved upon a series of Assistant United States Attorneys ("AUSAs"): AUSA Arthur

---

[4]  Pelullo submitted with his brief 22 exhibits.  They will be referred to herein as "P-1," "P-2," etc.

15

P. Zucker (1990 -      ) (P-21); AUSA Jose P. Sierra (1992 - 1995) (P-11); and Mark W. Rufolo

(1995 -    ) (P-12).  AUSA Rufolo, with AUSA Leslie Schwartz, ably conducted the pretrial

proceedings, the trial and the post trial proceedings until he left the U.S. Attorney's Office (P-

12).

     Raymond A. Wren was the Special Agent in Charge of the U.S. Department of Labor

OIG/OLR in Newark.  (P-15).   He later assumed the tittle Regional Inspector General,

Investigations.  "OIG" refers to U.S. Department of Labor's Office of Inspector General and

"OLR" refers to U.S. Department of Labor's Office of Labor Racketeering.  (P-14).  Included

among the DOL's agencies participating in the investigation was the U.S. Department of Labor's

Pension and Welfare Benefits Administration ("PWBA") (P-7M).

     A final participant in the investigation of Pelullo and the Compton Press matter was the

Federal Bureau of Investigation ("FBI").

     Chief Stewart authored a Case Initiative Report dated November 1, 1990 (approved by

U.S. Attorney Michael Chertoff) stating that his Strike Force office had opened an investigation

of Pelullo's diversion of assets from the Compton Press thrift and profit sharing plans.  Listed as

participants in the investigation were "AUSA A. Zucker Agents D. Mohr; FBI; S. Ruffino -

OLR; C. Pascale - PWBA."  (P-2).  Thus PWBA and its Carmine P. Pascale, were involved in

the criminal proceedings from the outset, with no mention of a civil case.

     In a November 15, 1990 letter to Chief Stewart, Special Agent Raymond A. Wren wrote

as follows:

       Re: LEONARD PELULLO
       Equity Funding Group
       PIE

OLR CASE NO. 91-NEW-002

Dear Mr. Stewart:

This will confirm that the U.S. Department of Labor's Office of Labor Racketeering (OLR) has opened an investigation into the above referenced matter.

OLR, FBI and PWBA (DOL) have opened an investigation of a potential embezzlement (18 USC 664) of 3,000,000 from the benefit plans of Compton Press which was sold in 1987 to Equity Finance Group.  Leonard Pelullo, a Scarfo LCN associate.

Additionally Leonard Pelullo, who has gained control of PIE (Pacific Intermountain Express Trucking) is $253,000 in arrears in Pension and Welfare Fund contributions on behalf of members of Local 560 IBT.

Special Agent [            ] has been assigned this investigation. Very truly yours,


Raymond A. Wren
Special Agent in Charge

(P-15) (emphasis added).  (See also P-20, a November 19, 1990 memo from Wren to Stuart

Elder, Chief of Field Operations of OIG/OLR in which he stated "Newark OLR is presently

participating in a joint investigation with FBI, IRS and PWBA.  The subject of the investigation

is LEONARD A. PELULLO, and the various companies that he owns," (specifically Compton

Press, Inc.).

This Wren letter and memo strongly suggest that the DOL's OIG/OLR had taken over

responsibility for the criminal investigation of the alleged $3,000,000 embezzlement from the

benefit plans of Compton Press.  They also strongly suggest that PWBA's role was not limited to

monitoring a civil action against Pelullo; rather that PWBA was a full-fledged partner in the

17

criminal investigation in the instant case.  This suggestion is corroborated by the November 28, 1990 memorandum of the DOL's Office of Organized Crime and Racketeering regarding the criminal investigation of Pelullo:

> Newark OLR is currently cooperating with the FBI and <u>PWBA</u> in an investigation of the above subjects.  LEONARD PELULLO has been identified as an associate of the NICKY SCARFO Organized Crime Family by the New Jersey State Commission of Investigation.  He was featured in a BUSINESS WEEK article dated October 23, 1989 wherein he was described as a "workout specialist."

(P-8).  (emphasis added and still no reference to a civil proceeding).  The memorandum proceeds to describe the diversion of assets from the Compton Press employee benefit plans.

The exhibits that Pelullo recently obtained and now submits confirm that the DOL and its relevant agencies, including PWBA, were full fledged members of the prosecution team; in fact they were the prosecution team, providing the U.S. Attorney's Office attorneys with the evidence they needed to conduct the trial.

The subject of the Case Opening Report of DOP's Office of Inspector General, Office of Organized Crime and Racketeering dated November 5, 1990 was Leonard Pelullo.  It recited that "Compton Press was sold on July 1, 1987 to Equity Finance Group.  At the time, it had several million in thrift and profit sharing plans.  In May of 1989, Pelullo gained control of Equity and promptly appointed himself [deleted]."  The document then described the transfers of funds from the Plans.

Following a recital of the criminal statutes alleged to have been violated and just before the description of Pelullo's alleged role just described, the Case Opening stated: "The following is a cooperative investigation between FBI, <u>PWBA</u>, and OLR."  (P-7A-M) (emphasis added).

18

Exhibits P-7A through 7L are, with two exceptions, each a File Review Cover Sheet, starting with a Cover Sheet signed February 14, 1991 and concluding with one signed December 27, 1994.  They are periodic reports of progress of the investigation authored by OIG/OLR Special Agent Raymond Wren.  A description of the first File Review Cover Sheet (P-7A) is typical of the rest, each reciting the role of PWBA.

Its "Title" was "Leonard Pelullo/Equity Finance Group/P.I.E. Trucking."[5]  After "Date opened" appeared "11/05/90."  The "Synopsis recited:

> OLR, FBI and <u>PWBA</u> (DOL) have opened an investigation of a potential embezzlement (18 U.S.C. 664) of $3,000,000 from the benefit plans of COMPTON PRESS, INC. which was sold in 1987 to EQUITY FINANCE GROUP.  In 1989 LEONARD PELULLO, a SCARFO LCN associate purchased EQUITY FINANCE GROUP. PELULLO [          ] COMPTON'S Benefit Plans. [          ] $3,000,000 was removed from the benefit plans under suspicious circumstances (loans made to parties related to PELULLO or to his business associates . .. (emphasis added).

After "Date case plan submitted" appeared "02/05/91."  After "Prosecuting Office" appeared "U.S. Attorney - Newark, N.J."

Under the heading "Objectives for the next 120 days (Case Agent & Supervisor/SAC)" appeared:

> Continue analyzing various bank and brokerage accounts related to COMPTON PRESS, INC. BENEFIT PLANS.  This analysis is needed in order to establish the purpose for various significant disbursements from the COMPTON bank accounts made by PELULLO, and/or his business associates shortly after they took over as trustees of COMPTON'S Benefit Plans and EQUITY FINANCE

---

[5]  Apparently P.I.E. Trucking was another company that the federal authorities believed Pelullo and his associates were looting.  Although the Cover Sheets continue to refer to P.I.E. Trucking in their Titles, it appears that at some point the investigation concentrated on the Compton Press matter.

GROUP (owner of COMPTON PRESS, INC.)

Attached to each Cover Sheet was a File Review Checklist that includes the following:

    4.  Is the case file properly maintained and serialized?

    5.  Is indexing of pertinent information being accomplished?

    6.  Is evidence being properly accounted for and documented?

Thus File Review Cover Sheets were prepared through December 27, 1994, each reciting that "OLR, FBI and PWBA (DOL) have opened an investigation" (emphasis added) into Pelullo's alleged embezzlement.  The Cover Sheets described the financial analyses conducted, plans to subpoena individuals, preparation of flow charts, interviews of former Pelullo employees.

The April 27, 1992 Cover Sheet first mentioned the civil suit against Pelullo: "Pelullo has returned to the pension plans approximately $3,000,000.   This resulted from various civil suits filed by the former employees of COMPTON and a Federal Judges's order to make restitution." (P-7E).  Because PWBA had been part of the investigating team since November 5, 1990, its role cannot have been simply to monitor those civil actions.

If there were any doubt that PWBA's monitoring of the civil action was an adjunct of its criminal investigation of the Compton Press matter, it is resolved by Exhibit P-9.  PWBA contemplated starting a civil action regarding Compton Press-Pelullo, and it inquired of the U.S. Attorney's Office if, in light of the criminal investigations, it had any objections.  U.S. Attorney Chertoff, acting through an AUSA, responded to this inquiry in an April 22, 1992 letter, stating:

> In response to your recent communications regarding Compton
> Press-Pelullo and [          ], please be advised that we have no
> objection to your office initiating civil action in these two matters
> anytime after forty-five days from this date, with the following
> provisions:

First, if any government witness in the criminal case is to be deposed, we would want to be notified and so that provision can be made to have the criminal assistant present during the deposition.

Second, we would like to have a copy of any civil discovery from the defendants provided to us, and we would ask that you make every effort to depose the defendants as soon as possible in the process.

Third, no civil settlement will be agreed to without our written consent.

This point is extremely important because there have been situations in which language within a DOL civil settlement has been used against the Government in a subsequent criminal trial.

In fact, PWBA did not start its own civil action.  Rather, it monitored the civil actions instituted by Compton Press's former owners and others.  This clearly was part and parcel of its criminal investigation; it in no way eliminated its obligation to enable the U.S. Attorney's Office to participate in depositions and to provide that Office with all civil discovery it received from the defendants in those cases.  Finally, the letter confirmed the fact that PWBA, whether performing in its civil or criminal capacity, was operating in lock-step with the personnel of the U.S. Attorney's Office handling the Pelullo criminal case.

The December 29, 1992 Cover Sheet (P-7F) reflected that "[a]n interim report was initiated which reflected OLR's position to indict Leonard Pelullo.  The completed report is expected within the next reporting period.  The report is meant to fully brief the newly assigned AUSA . . .  A new AUSA has been assigned this case which has resulted in delays."

The combined December 29, 1992 and April 27, 1993 Cover Sheets (P-7G) reflect that "former employees were interviewed, witnesses were subpoenaed to testify in the Grand Jury and "[c] orporate records (seized by FBI-Jacksonville, Florida) were reviewed."

The August 6, 1993 Cover Sheet (P-7H) recited that the objectives for the next 120 days were:

1.  Prepare referral for prosecution.

2.  Assist AUSA in preparation for Pros Memo.

3.  Make final presentation to Grand Jury.

Exhibit P-7J is not a Cover Sheet.  It is a document entitled "Criminal Results" and is also initiated by Raymond Wren.  It recites that Pelullo had been indicted and charged with money laundering, embezzlement and criminal conspiracy.  The document summarized the allegations of the indictment.  It concluded with the statement, "[t]his investigation was conducted by the U.S. Department of Labor's Office of Labor Racketeering and Pension and Welfare Benefits Administration and the Federal Bureau of Investigation (emphasis added).

The August 26, 1994 Cover Sheet (P-7K) noted that the DOL team is to "[p]rovide prosecutive support after the indictment is obtained."

Exhibit P-7M is another Criminal Results Narrative.  It summarized the allegations of the December 9, 1994 superseding indictment and concluded with the statement: "[t]his investigation was conducted by the U.S. Department of Labor's Office of Labor Racketeering, the Federal Bureau of Investigation, and the U.S. Department of Labor's Pension and Welfare Benefits Administration."   (emphasis added).

Despite the evidence that has now come to light to the contrary, the government has continually represented to the Court of Appeals and this court that the role of the PWBA in this case was simply to monitor the civil action that Gerardi and others had filed against Pelullo in the New Jersey District Court.  For example, in its First Step Brief on the appeal from the order

22

granting Pelullo a new trial it stated:

> While the USAO in New Jersey and agents from the Labor
> Racketeering Office of the DOL (which is responsible for enforcing
> violations of federal criminal law) were investigating Pelullo's
> actions with respect to the Pension Plans, officials of the Pension and
> Welfare Benefits Administration ("PWBA"), a civil arm of the DOL,
> were separately monitoring a lawsuit, <u>Gerardi et al. v. Pelullo et. al.</u>,
> United States District Court for the District of New Jersey, Civ. No.
> 89-4069.  That case, like this one, involved the conversion of the
> Pension Plans' assets.  The PWBA collected documents which had
> been exchanged in discovery between Pelullo and the other litigants
> in that civil case.  Op. at 4, 22.
>
> The District Court held, Op. at 13-14, 22, that the government
> suppressed a document relating to the civil case that was possessed
> by the PWBA, on the ground that the material was in the files of the
> same government agency that prepared the case for trial.  To the
> contrary, the New Jersey prosecution team did not constructively
> possess documents that were possessed by the PWBA.  As this Court
> explained on direct appeal in this very case: "the government is not
> under an obligation to obtain and disclose all information in the
> possession of other arms of government that are not involved in the
> particular prosecution."  <u>United States v. Pelullo</u>, 185 F. 3d 863, slip
> op. at 10, citing <u>United States v. Morris</u>, 80 F. 3d 1151, 1169 (7th Cir.
> 1996) and <u>United States v. Locascio</u>, 6 F. 3d 924, 949 (2d Cir. 1993).

(P-13 at 63, 64)

Totally contradicting this representation, the Regional Director of the DOL's Employee

Benefits Security Administration (successor to PWBA) wrote to Pelullo on December 31, 2008,

acknowledging that PWBA investigated the criminal case against Pelullo in addition to the civil

case:

> In the interest of complete and full disclosure, we are providing you
> with the following information:
>
> <u>There were two criminal cases involving Compton Press which were
> investigated by our office [at that time, PWBA] in addition to the
> civil cases:</u>

23

Compton Press Profit Sharing Plan - case #30-011322(52)

Compton Press Thrift Plan - case # 30-011323(52)

The New York Regional Office of PWBA and then EBSA maintained no case files for these cases. All case files were maintained by the U.S. Attorney's office in Newark, New Jersey, and the DOL/OIG Office of Labor Racketeering, located in Newark, New Jersey at the time that the cases were worked - it has since relocated to Mountainside, New Jersey.

(P-18) (emphasis added)

Documents authored subsequent to Pelullo's conviction confirm PWBA's role as an

active participant in the investigation. The DOL Case Closing Report dated March 4, 1998

provided a synopsis of the charges, and after "Primary Agency" entered "Joint Agencies: FBI

PWBA." (P-19).

The DOL issued a November 13, 1996 press release (P-10) upon the occasion of the jury

verdict finding Pelullo guilty on all 54 counts of the indictment charging him with

embezzlement, money laundering and conspiracy in the looting of the Compton Press employee

benefit plans. The press release included the following statement:

According to Raymond A. Wren, regional inspector general of investigations for the U.S. Department of Labor's Office of the Inspector General (OIG), Division of Labor Racketeering, and John R. Wehrum, Jr. regional director of the Pension and Welfare Benefits Administration (PWBA), Pelullo carried out the embezzlement from 1989 through 1991 by conducting a series of financial transactions through various companies to conceal the source of the embezzled money.

…

The investigation leading to the conviction was conducted by the U.S. Labor Department's OIG and PWBA, and the Federal Bureau of Investigation.

24

The DOL Office of Investigations issued a Significant Event Report (press release) upon the occasion of Pelullo's December 8, 1997 sentencing.  The last sentence stated: "This was a joint investigation with the Pension and Welfare Benefit Administration and the Federal Bureau of Investigation."  (P-6).

This is strong evidence that the government misinformed the Court of Appeals and this court that PWBA's role was limited to lending DOL personnel to the prosecution team and monitoring the civil action against Pelullo, and that PWBA was not a member of the prosecution team.[6]

## III. Discussion

A. Jurisdiction:  Pelullo brings this action pursuant to Fed. R. Civ. P. 60(b)(6) and (d)(1) and (3).  Most of the provisions of Rule 60(b) are time-barred or on their face are inapplicable. Rule 60(b), however, provides that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> …
>
> (6) any other reason that justifies relief.

Rule 60(d)(1) provides that:

(d) Other Powers to Grant Relief.  This Rule does not limit a court's power to:

---

[6]  It was unnecessary for the Court of Appeals to address the questions of whether Pelullo could have obtained the withheld information through the exercise of reasonable diligences or whether that information was favorable to the defense and material, or whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.  See 399 F. 3d at 219.

(1) entertain an independent action to relieve a party from a
judgment, order or proceedings;

…

(3) set aside a judgment for fraud on the court.

The government urges that, in the first place, Rule 60(b) is a rule of civil procedure,

inapplicable in a criminal case such as this.  Secondly, the government contends that even were

Rule 60(b) applicable, the court lacks jurisdiction, because it is a second § 2255 petition, 28

U.S.C. § 2255, and Pelullo has failed to obtain a certification of the Court of Appeals, § 2255(h).

The government relies upon Pridgen v. Shannon, 380 F. 3d 720 (3d Cir. 2004), which holds that

when a Rule 60(b) motion collaterally attacks the petitioner's underlying conviction, it must be

deemed a § 2255 petition requiring Court of Appeals certification when it is a successive such

petition.  It is not deemed a § 2255 petition when it attacks "the manner in which the earlier

habeas judgment was procured."  Id. at 727.

In the present case, at first blush, Pelullo's motion appears to be an attack on the

judgment of conviction.  It is entitled "Motion to Vacate the Judgment of Conviction and

Dismiss the Indictment with Prejudice."  Accordingly, for relief it asks "that this Honorable

Court vacate the judgment of conviction, dismiss the indictment with prejudice, or in the

alternative, grant a new trial and release Petitioner forthwith."   (Memo in Support of Motion at

p. 51).

However, when one considers the totality of the allegations and the likely relief that

would result from validation of the allegations, this is not a direct attack on the judgment of

conviction; it is an attack on the manner in which the earlier habeas judgment was procured.  It is

a challenge to the proceedings addressing just one phase of this case - the appeal from this court's order granting a new trial.  The alleged unfairness is that in order to persuade the Court of Appeals that the DOL documents were not <u>Brady</u> material, the government falsely represented to that Court, and subsequently to this Court, that the PWBA was not a part of the prosecution team and, therefore, documents in its possession were not <u>Brady</u> material.  In these circumstances Pelullo's motion will not be deemed a successive § 2255 petition, barred by his failure to obtain a Court of Appeals certification.[7]

The court discerns three arguable grounds for jurisdiction.  The first is Rule 60(b)(6)'s "any other reason that justifies relief."  The second is the grant of power to a court in Rule 60(d)(1) "to entertain an independent action to relieve a party from a judgment, order or proceeding."  The third is the general equity power of the court to address grievous abuses of the judicial process.

<u>United States v. Beggerly</u>, 524 U.S. 38 (1998) illustrates that in extraordinary circumstances a court can entertain an independent action to relieve a party from a judgment or order.

> The new rule thus made clear that nearly all of the old forms of obtaining relief from a judgment, <u>i.e.,</u> <u>coram</u> <u>nobis</u>, <u>coram</u> <u>volis</u>, <u>audita</u> <u>querela</u>, bills of review, and bills in the nature of review, had been abolished.  The revision made equally clear, however, that one of the old forms, <u>i.e.,</u> the "independent action," still survived.
>
> The "independent action" sounded in equity.  While its precise contours are somewhat unclear, it appears to have been more broadly

_____

[7]  The likelihood of Pelullo obtaining such a certification is slim indeed, requiring a showing that "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found the movant guilty of the offense."  28 U.S.C. § 2255(h)(1).

available than the more narrow writs that the 1946 Amendment
abolished.

Id. at 45.  The Court cautioned, however, that "[i]ndependent actions must, if Rule 60(b) is to be

interpreted as a coherent whole, be reserved for those cases of 'injustices which, in certain

instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the

doctrine of res judicata."  Id. at 46.

The Court concludes that at this juncture it has jurisdiction to proceed.  Allowing a court

to proceed in a criminal case on the basis of government misrepresentations is such a

fundamental departure from principles of justice that it must be addressed in one manner or

another to preserve the integrity of the Court.  One or the other of the three potential

jurisdictional bases referred to above provides the means.

B.  Likely Relief: While the misrepresentations are spelled out with considerable

definitiveness, the circumstances of the making of these misrepresentations is far from clear.

The DOL team, including the PLWB, appears to have proceeded in a consistent, well organized

way developing its case, preserving the evidence and presenting it to the U.S. Attorney's Office

where it was employed with great skill and effect at Pelullo's trial.  The evidence is less clear

about the overall organization of this case by the U.S. Attorney's Office.  Although there is

considerable evidence that the government misrepresented facts to the Court of Appeals and to

this Court and that diligent inquiry on the government's part would have alerted the government

to its errors, the Court has not at this point found that the misrepresentations were made with an

intent to deceive.

There are circumstances that suggest why the government was so poorly informed.  In

1990 when the investigation of this case was at its beginning it was part of a much larger

investigation being conducted by the Strike Force Division headed by its able and experienced Chief, Robert C. Stewart. The subject of the Strike Force investigation was wide-spread organized crime "crash and burn" operations, of which Pelullo's Compton Press operation was but one. The Strike Force was either disbanded or for other reasons removed from the Pelullo investigation and the U.S. Attorney's Office turned over this extraordinarily complex case to a succession of relatively young and inexperienced AUSAs - in 1990, 1992, and 1995. Investigatory responsibility fell to the DOP's OLR and PWBA and to the FBI. On the occasion of the assignment of each new AUSA the DOL team had "to fully brief the newly assigned AUSA" (P-7F).

While these AUSAs acquired enough information to administer pretrial proceedings and ably try the case, it would not be surprising if they never fully mastered the mountain of potentially relevant documents and the role that each member of the investigatory team was playing.

If Pelullo succeeds in establishing the allegations of his motion, various forms of relief are possible. They could extend from vacating the conviction and dismissing the indictment at one extreme to doing nothing at the other extreme. Neither result is likely.

One reasonable approach would be to attempt to put Pelullo in the position he would have been had the government not made the misrepresentation to the Court of Appeals. In that event the Court of Appeals would have decided the appeal from this court's new trial order with a holding that the DOL documents were Brady material. There is no assurance that such a holding would result in an affirmance of this Court's new trial order. The holding that the Florida warehouse documents were not Brady material remains unchallenged. The DOL documents are

few in number, and the Court of Appeals had not addressed their materiality.  Also possible is a ruling that the Court's reversal would not have been affected by a truthful account of PWBA's role in the investigation and a finding that the DOL documents were <u>Brady</u> material.  Relief might be limited to dealing with the government's apparent failure to provide accurate information.

   C.  <u>The Bail Motion</u>: On an earlier occasion after the Court granted Pelullo's motion for a new trial it ordered him released on bail, finding that he was not likely to flee or constitute a danger to the community.  Those findings can still be made at this time.

   However, despite the fact that there is a likelihood that Pelullo will be able to establish that the government misrepresented to the Court of Appeals and to this Court the PWBA's role in the investigation of this case, at this point in this proceeding the likelihood that this will result in the vacation of his conviction or a new trial is problematical.

   Pelullo was convicted on the basis of substantial evidence that has been the subject of prior opinion of this court.  The conviction has been challenged on many grounds on numerous occasions and has survived those challenges.

   This court has not decided how it should rule on Pelullo's Rule 60(b) motion.  In the present circumstances bail is not appropriate and Pelullo's motion for bail will be denied.


         ***s/ Dickinson R. Debevoise***  
June 25, 2010        DICKINSON R. DEBEVOISE  
            U.S.S.D.J.